

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED
THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed July 7, 2023**

_____
**United States Bankruptcy Judge**
_____

**United States Bankruptcy Court**
**Northern District of Texas**
**Dallas Division**

| | | |
|---|---|---|
| In re: | § § | |
| Jeremy Chad Molinar, | § § | Case No. 21-31109-swe-7 |
| Debtor. | § § § | |
| | § | |
| Amex Electric Services Dallas—Fort Worth, Inc., | § § § | |
| Plaintiff, | § § | Adv. No. 21-03072-swe |
| v. | § § | |
| Jeremy Chad Molinar, | § § | |
| Defendant. | § § | |

### *Findings of fact and conclusions of law*

In this case, the Plaintiff has (1) asserted claims against the Debtor for (i) fraud and (ii) misapplication of trust funds under Chapter 162 of the Texas Property Code (the "**Texas Construction Trust Fund Act**") and (2) requested a declaration that the Plaintiff's claims against the Debtor are nondischargeable under sections 523(a)(2), (4), and (6) of the

1

Bankruptcy Code. For the reasons stated below, the Plaintiff failed to prove any underlying claims against the Debtor that could potentially be declared nondischargeable. The following are the Court's findings of fact and conclusions of law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[1]

## I. Jurisdiction and Venue

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157 because it involves core matters under 28 U.S.C. § 157(b)(2)(A), (B), and (I). Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a).

Both parties consent to the Court's entry of final judgment on the Plaintiff's claims and any defenses relating to such claims.[2]

## II. Background

The Debtor is the CEO and sole owner of Molinar Property Group, LLC ("**MPG**"), a commercial construction company. In June 2020, MPG entered into a contract with HIC V Limited Owner LLC ("**Harwood**") under which MPG would serve as the general contractor for construction of a restaurant in Dallas (the "**Harwood Project**"). Around the time of the Harwood Project, MPG had about twenty-seven employees and about fifteen other projects in process. Though he was the CEO of MPG, the Debtor was not the project manager for the Harwood Project.

The total contract price between Harwood, as the owner of the restaurant, and MPG, as the general contractor, was approximately $1.5 million. As a general contractor, MPG subcontracted with other companies to complete various aspects of project construction. On the Harwood Project in particular, MPG used roughly fifteen subcontractors. One of those subcontractors was the Plaintiff, Amex Electric Services Dallas—Ft. Worth, Inc. ("**Amex**"), which contracted with MPG in July 2020 to provide electrical work on the Harwood Project. The total amount to be paid

---

[1] Any finding of fact that more properly should be construed as a conclusion of law shall be considered as such, and *vice versa*.

[2] *See Joint Proposed Pre-Trial Order*, Docket No. 59 (the "**Joint Pretrial Order**").

to Amex for labor, materials, and equipment under the subcontract was $203,000, subject to additions and deductions by written change order.

Payments for the subcontractors on the Harwood Project went through MPG. After completing portions of the work, Amex and the other subcontractors would submit applications for payment to MPG, which gathered the applications and submitted an aggregated payment application to Harwood.[3] When Harwood paid MPG, MPG was supposed to use those funds to pay Amex and the other subcontractors. Funds that MPG received related to the Harwood Project were deposited in a separate account controlled by the Debtor and another representative for MPG.

The process worked roughly as intended for a brief time, with Amex submitting payment applications to MPG, MPG submitting payment applications to Harwood, Harwood paying MPG, and MPG paying Amex. On or about October 29, 2020, Amex received a progress payment of $54,189 from MPG. But that was the only payment that Amex received from MPG for the Harwood Project.

In December 2020, MPG stopped work on the Harwood Project before the work was complete, causing Amex to cease work as well. The president and owner of Amex testified that when work stopped, Amex had completed over 75% of the work under the subcontract. Amex's application for payment dated December 14, 2020, shows the value of the work completed by Amex as of that date as $211,969,[4] which would mean that Amex was still owed approximately $157,780 after accounting for the payment that Amex received in October.

Even though MPG received over $870,000 on the Harwood Project, the Debtor claims that Harwood owed MPG more and that MPG did not have enough funds to pay its subcontractors.

Amex filed a mechanic's lien in the real property records and also filed a lawsuit in state court in February 2021 against MPG, the Debtor, and

---

[3] Harwood's payment obligations were subject to its right of retainage—that is, Harwood's right to withhold a portion of the funds that are due to contractors or subcontractors until construction was finished.

[4] Pl.'s Ex. 7.

Harwood for unpaid amounts under the subcontract with MPG.[5] Amex settled its claims against Harwood in the State Court Action for $116,240.81, $33,240.81 of which was paid directly to Amex and $83,000 of which was paid to one of Amex's vendors for the project, satisfying Amex's obligation to that vendor. After considering this settlement payment, Amex is still owed approximately $41,540.

The Debtor filed a personal, voluntary Chapter 7 bankruptcy case on June 15, 2021, in this Court, staying the State Court Action against the Debtor.[6]

Amex timely filed this adversary proceeding, asserting causes of action against the Debtor for (I) fraud; (II) violation of the Texas Construction Trust Fund Act; (III) exception to discharge under 11 U.S.C. § 523(a)(2)(A) and (B); (IV) exception to discharge under 11 U.S.C. § 523(a)(4); and (V) exception to discharge under 11 U.S.C. § 523(a)(6).[7] The Court held trial in this matter on February 8, 2023.[8]

### III. Discussion

Amex's pursuit of a nondischargeable claim against the Debtor is a two-step process. To establish that the Debtor owes Amex a nondischargeable debt, Amex must first establish that the Debtor owes Amex a debt, and then Amex must show how and why that debt should be excepted from discharge. The Court will begin with an analysis of Amex's underlying claims.

---

[5] Cause No. DC-21-01873, 192nd Judicial District Court (the "**State Court Action**").

[6] The Debtor's debts were discharged in his bankruptcy case on December 22, 2021, subject to the outcome of this Adversary Proceeding concerning Amex's alleged non-dischargeable debt.

[7] *Plaintiff's Original Objections to Discharge of Debtor and Adversary Complaint*, Docket No. 1 (the "**Complaint**").

[8] After trial, both parties submitted supplemental briefing regarding damages. *See Plaintiff's Post Trial Brief*, Docket No. 65; *Defendant's Post-Trial Brief*, Docket No. 66.

### A. Amex's Underlying Claims Against the Debtor (Counts 1 and 2)

The facts supporting Amex's claims against the Debtor are not terribly complicated. Between July 2020, when Amex began its work on the Harwood Project, through the end of 2020, when work stopped, MPG received payments of over $870,000 on the Harwood Project. Those funds went into an MPG account over which the Debtor had control. Amex contends that those funds should have been held in trust for Amex and eventually paid to Amex, but they were not. There is no evidence that those funds were either used for other proper purposes or stolen from MPG.

What makes this case challenging, though, is not what is known but what is unknown. For instance, few of MPG's business records—and none of its bank account statements—were included in the evidence at trial. The Debtor claims he no longer has access to MPG's business records on account of being locked out of MPG's office space by its landlord. As a result, there is very little evidence of where the money that MPG received for the Harwood Project went. And, importantly, whatever was done with the funds that MPG received for the Harwood Project, there is a lack of evidence of who did it. The testimony from the Debtor was that both he and Bambi Davis, who served as the chief financial officer for MPG, had access to the account that held the funds in question but that only Ms. Davis handled payments to the subcontractors for the Harwood Project. Ms. Davis did not testify at trial.

Amex has asserted two underlying claims against the Debtor: fraud and violation of the Texas Construction Trust Fund Act. The Court will consider each of these claims in turn to determine whether the evidence adduced at trial satisfies the elements of a claim against the Debtor individually.

#### 1. *Fraud*

To recover on an action for fraud, the plaintiff must prove that (1) the defendant made a material representation, (2) the representation was false, (3) when the defendant made the representation, he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (4) the defendant made the representation with the intention that it should be acted upon by the plaintiff, (5) the plaintiff

5

acted in reliance upon the representation, and (6) the plaintiff thereby suffered injury. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997) (citing *Stone v. Lawyers Title Ins.*, 554 S.W.2d 183, 185 (Tex. 1977)); *see also Ward Family Found. v. Arnette (In re Arnette)*, 454 B.R. 663, 680 (Bankr. N.D. Tex. 2011) (citing *Bradford v. Vento*, 48 S.W.3d 749, 755–56 (Tex. 2001)).

In the Complaint, Amex only identified one basis for its cause of action for fraud: the Debtor's alleged forgery of an unconditional release and waiver purportedly signed by Amex. Docket No. 1 ¶¶ 19–24. In briefing and at trial, Amex also alleged that the Debtor made a false representation regarding the payment of subcontractors in an unconditional waiver and release signed by MPG and that the Debtor made false promises to keep Amex on the job during the Harwood Project. Amex also seemed to argue in briefing and at trial that it may have a claim for fraud against the Debtor even if the traditional elements of fraud have not been satisfied.

For the sake of completeness, the Court will address each of these four potential bases for Amex's fraud claim separately.

    i.    **The alleged forgery of an unconditional waiver and release on progress payment from Amex**

When subcontractors for the Harwood Project were paid, they provided an "unconditional waiver and release on progress payment" acknowledging receipt of the payment and releasing any rights to a mechanic's lien for that amount. Amex executed one of these on November 9, 2020, after receiving a payment of $54,189.[9] After work had stopped on the Harwood Project, Amex discovered that Harwood was in possession of a second unconditional waiver and release purportedly from Amex dated December 9, 2020, acknowledging receipt of an additional $142,653 (the "**Amex December UWR**").[10] Mr. Alvarez, Amex's president, testified that despite his signature appearing on the Amex December UWR, he did not sign it, and Amex never received the $142,653.

---

[9] Pl.'s Ex. 5.

[10] Pl.'s Ex. 6.

6

The Court finds Mr. Alvarez's testimony regarding the Amex December UWR credible, but the mere fact that the Amex December UWR was forged and apparently presented to Harwood by MPG is not sufficient to satisfy the elements of a fraud claim against the Debtor. The Amex December UWR could be considered a false representation that Amex had been paid an additional $142,653, but the evidence did not show that the Debtor made that representation. The evidence showed that a representative of Harwood claimed in an e-mail that Harwood received the Amex December UWR from MPG,[11] but the Harwood representative did not testify at trial and the e-mail did not identify who at MPG was alleged to have sent the Amex December UWR to Harwood. The Debtor denied forging the Amex December UWR or having any knowledge of it, and there was not sufficient evidence to find to the contrary.

Even if the Court were to find that the Debtor made the misrepresentation found in the Amex December UWR, the claim would still fail because the misrepresentation was not made to Amex, the misrepresentation does not appear to have been made with the intention that Amex act upon it, Amex did not act in reliance on the misrepresentation, and it is not clear how Amex was harmed by the misrepresentation.

It is helpful to note that the Amex December UWR was allegedly executed on December 9, 2020, but the last payment from Harwood to MPG for electrical work was made in late November, and Amex did not know about the forged document until later when work had already stopped. So whatever the purpose of the Amex December UWR was, it does not appear to have induced any payments from Harwood or action from Amex. It also does not appear to have injured Amex, which was still able to obtain a substantial settlement payment from Harwood in subsequent litigation.

    ii.    **The false representation in an unconditional waiver and release on progress payment from MPG**

To try to show misrepresentations by the Debtor, Amex also presented an unconditional waiver and release executed by MPG dated December 28, 2020 (the "**MPG December UWR**"),[12] acknowledging receipt of a

---

[11] Pl.'s Ex. 12 at HIC 000140.

[12] Pl.'s Ex. 8.

7

payment of $836,382.77 and warranting that those funds had been used, or would promptly be used, to pay subcontractors in full.

There was no showing at trial that the representation in the MPG December UWR that MPG had been paid $836,382.77 in connection with the Harwood Project was false. While MPG does not appear to have received that sum all at once in December, checks were entered into evidence at trial showing payments to MPG over the course of the Harwood Project of over $836,382.77. But the representation in the MPG December UWR that MPG had already paid or would use the funds received from the progress payment to promptly pay all of MPG's laborers, subcontractors, materialmen, and suppliers in full does appear to be false. The Court knows very little about the use of the funds MPG received from Harwood other than that Amex appears to have received $54,189, but even if the funds were used to pay MPG's laborers, subcontractors, materialmen, and suppliers, they do not appear to have been paid in full.

Although there appears to be a misrepresentation in the MPG December UWR, it is not clear that the Debtor made that misrepresentation. The MPG December UWR bears the Debtor's signature, but the Debtor claims he did not sign it. Rather, the Debtor testified that MPG's chief financial officer dealt with the unconditional waivers and releases, that he personally had not seen any of them, and that if his signature appeared on them, it was because MPG representatives used a stamp of his signature. The Debtor would go over the books with his team at least once per week, but he was also overseeing sixteen projects with over twenty-seven employees at that time.

After considering the available evidence, the Court finds it more likely than not that the Debtor either signed or authorized the signing of the MPG December UWR.

Nevertheless, even with a finding that the Debtor made the representations in the MPG December UWR and one of them was false, the claim for fraud still fails because the representation was not made to Amex, the misrepresentation does not appear to have been made with the intention that Amex act upon it, Amex did not act in reliance on the representation, and Amex was not harmed by the representation.

8

### iii. Alleged false promises to keep Amex on the job

The final category of misrepresentations alleged by Amex were characterized by Amex as promises designed to keep Amex on the job. The testimony at trial was that these representations generally related to (1) MPG's assertions that it was not being paid by Harwood, (2) MPG's attempts to get paid by Harwood, and (3) the timing of expected payments from MPG to Amex.

The evidence did not show that the representations that MPG was waiting on payments from Harwood were false. Nor did the evidence show that representations about MPG's planned attempts to obtain payment from Harwood were false. To the extent the Debtor promised payment to Amex, those promises were false, but there was not a sufficient showing that the Debtor knew they were false when he made them or had no intention of performing at the time the promises were made. Amex also did not show what work it claims it performed in reliance on those promises. From the testimony, it sounds as though most of the alleged promises were made after work had stopped.

Because Amex has not shown that the Debtor made knowingly false representations that Amex relied on and suffered harm from, Amex's claim for fraud based on the Debtor's alleged false promises designed to keep Amex on the job must fail.

### iv. A fraudulent scheme beyond the traditional test

While its argument was not clearly articulated, Amex also appeared to urge the Court to find a fraudulent scheme in a more general way. That is, perhaps the alleged misrepresentations discussed above and other circumstances are badges of fraud that can still support a claim. Some courts in Texas have acknowledged the possibility of fraud outside of the traditional elements:

> But not all fraud is comprehended within elements of the traditional test. Fraud is multiform and as such admits of no single, all-encompassing definition. *See First State Bank of Miami v. Fatheree*, 847 S.W.2d 391, 396 (Tex. App.–Amarillo 1993, writ denied). The gist of fraud is successfully using cunning, deception or artifice to cheat another to the other's injury. *See id.*

9

*McEwin v. Allstate Tex. Lloyds*, 118 S.W.3d 811, 816 (Tex. App.—Amarillo 2003, no pet.).

Even with this additional latitude to prove fraud, Amex did not prove a claim against the Debtor individually. While Amex may have some sort of claim against MPG, Amex failed to prove improper actions by the Debtor (rather than by other MPG representatives) and failed to prove misuse or diversion or funds. Those failures prevent a finding of fraud against the Debtor in this case.

Amex has not established that the Debtor committed fraud under any of its theories. The Debtor, therefore, does not owe Amex a debt pursuant to Amex's fraud claim.

### *2. Violation of the Texas Construction Trust Fund Act*

Amex asserts that the Debtor is liable for the misapplication of trust funds under section 162.031(a) of the Texas Construction Trust Fund Act, which provides as follows:

> A trustee who, intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds, has misapplied the trust funds.

Several requirements of the statute are clearly satisfied. Funds that MPG received from Harwood for the Harwood Project were trust funds under section 162.001(a). Amex, as a subcontractor that furnished labor and material for the construction or repair of an improvement on specific real property, is a beneficiary of any trust funds paid or received in connection with the improvement under section 162.003(a). The Debtor, as an owner and officer of the contractor that received the trust funds, was a trustee of the trust funds under section 162.002. Ms. Davis, as the chief financial officer of MPG and as an agent of MPG who had control over the trust funds, was also a trustee of the trust funds under section 162.002.

But Amex must also show that the Debtor (1) directly or indirectly retained, used, disbursed, or otherwise diverted trust funds without first fully paying all current or past due obligations incurred by the trustee

10

to the beneficiaries of the trust funds and (2) that he did so intentionally, knowingly, or with intent to defraud. *See Border States Elec. Supply of Texas, Inc. v. Coast to Coast Elec., LLC*, No. 13-13-00118-CV, 2014 Tex. App. LEXIS 5681, at *13–15 (Tex. App.—Corpus Christi, May 29, 2014, pet. denied) (holding that the supplier of a general contractor had the burden to show that the general contractor violated the Texas Construction Trust Fund Act).

While it is clear that all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds were not paid in full, the Debtor testified that MPG paid all funds received from Harwood to the respective subcontractors in accordance with the subcontracts.[13] He further testified that MPG did not receive all the funds due on the subcontracts from Harwood after MPG ceased work on the Harwood Project and that of the fifteen subcontractors who worked on the Harwood Project, around eight or nine were still owed money from funds Harwood never paid to MPG.

There was no other evidence regarding the direct or indirect retention, use, disbursement, or diversion of the trust funds. Rather, it appears that Amex is asking the Court to simply assume that since Amex was not paid, something improper must have occurred. Even if the Court makes that assumption, though, it must still find that it was the Debtor who did the retaining, using, disbursing, or diverting, and that the Debtor did it intentionally, knowingly, or with intent to defraud.

The Debtor was not the only trustee of the funds at issue, and he testified that because MPG had about twenty-seven employees and about fifteen other projects in process, he did not manage the day-to-day operations of the Harwood Project or the payments to subcontractors, which he left to the project manager and Ms. Davis. The evidence simply does not support a finding that the Debtor intentionally or knowingly directly or indirectly retained, used, disbursed, or otherwise diverted trust funds.

---

[13] The Debtor also testified that a small amount of money was stolen from MPG by one of its employees, but the evidence was not clear on when the alleged theft took place and whether that money came from Harwood.

11

Section 162.005(1) the Texas Construction Trust Fund Act provides some guidance on whether the Debtor had an intent to defraud:

A trustee acts with "intent to defraud" when the trustee:

(A) retains, uses, disburses, or diverts trust funds with the intent to deprive the beneficiaries of the trust funds;

(B) retains, uses, disburses, or diverts trust funds and fails to establish or maintain a construction account as required by Section 162.006 or fails to establish or maintain an account record for the construction account as required by Section 162.007; or

(C) uses, disburses, or diverts trust funds that were paid to the trustee in reliance on an affidavit furnished by the trustee under Section 53.085 if the affidavit contains false information relating to the trustee's payment of current or past due obligations.

The evidence was not sufficient to show that the Debtor acted with an intent to deprive Amex of the trust funds as required by subsection (A) of section 165.005(1). Looking to subsection (B), the evidence was not sufficient to show that the Debtor failed to establish or maintain a construction account as required by section 162.006 or failed to establish or maintain an account record for the construction account as required by section 162.007. Looking to subsection (C), the evidence showed two potential affidavits containing false information relating to the payment of MPG's current or past due obligations, but neither satisfies the "intent to defraud" standard for the Debtor. The evidence simply did not show that the Debtor had anything to do with the Amex December UWR. There was more evidence regarding the MPG December UWR, but Amex still did not show that any funds were paid in reliance on the MPG December UWR or that if any funds were paid in reliance on the MPG December UWR, they were used, disbursed, or diverted by the Debtor.[14]

---

[14] MPG did receive a payment of $34,791.95 on December 28, 2020, the same day that the MPG December UWR was executed, but the evidence showed that the check for those funds was issued on December 22, 2020, and those funds did not relate to the electrical work performed by Amex. There was also no evidence to show that the funds received on December 28, 2020, were misapplied.

12

Because Amex has not shown that trust funds were misapplied and has not satisfied the scienter requirement with respect to the Debtor, Amex's claim against the Debtor for violation of the Texas Construction Trust Fund Act fails.

### B. Exception to Discharge Claims (Counts 3, 4, and 5)

Section 523(a) of the Bankruptcy Code provides that a discharge under section 727 does not discharge an individual debtor from certain types of debt. For a nondischargeability determination to be necessary, though, there must first be a debt. In this case, Amex has not shown any debt that is owed to Amex by the Debtor. Since there is no debt to be declared nondischargeable, Amex cannot be granted relief under section 523(a).

### C. Attorney's Fees

Amex also requested attorney's fees, but Amex has not stated a cognizable basis for awarding attorney's fees under any claim. Nor has Amex provided evidence of the reasonableness of its attorney's fees. Even if Amex had provided a basis for an award of attorney's fees and supporting evidence, Amex has not prevailed on its claims at trial and is therefore not entitled to attorney's fees or costs. The Court declines to award attorney's fees or costs in favor of Amex.

## IV. Conclusion

For the reasons discussed herein, the Court finds and concludes that Amex has failed to prove its claims. The Court will enter judgment in favor of the Debtor.

### End of Findings of Fact and Conclusions of Law ###